UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSE MOURA, SR., personal representative of the estate of Jose Moura, Jr., and LORI TURNER, individually and as next friend of minor plaintiffs A.M, C.M., and J.M.<br><br>Plaintiffs,<br><br>v.<br><br>BARBARA CANNON, administrator of the estate of John Paul Cannon, and SUCCESS LEASING, INC.,<br><br>Defendants. | CIVIL ACTION<br>NO. 4:17-40166-TSH |

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Docket Nos. 93 & 95)

**September 27, 2020**

**HILLMAN, D.J.**

Jose Moura, Sr., personal representative of the estate of Jose Moura Jr., and Lori Turner, individually and as parent and next friend of minor plaintiffs A.M., C.M., and J.M., (collectively, "Plaintiffs") bring this action against, *inter alia*, Success Leasing, Inc. ("Success") and Barbara Cannon, administrator of the estate of John Paul Cannon, ("Estate of Cannon") (collectively, "Defendants"), for claims stemming from the death of Jose Moura, Jr. Defendants move for summary judgment. (Docket Nos. 93 & 95). For the following reasons, the Court ***grants*** the motions.

**Background**

The following facts are undisputed unless otherwise stated. On December 14, 2016, John Cannon ("Cannon") was driving a tractor-trailer on Interstate 35 in Oklahoma when he crashed into a tractor-trailer stopped in front of him. Jose Moura, Jr. ("Moura") was resting in the sleeper compartment of Cannon's tractor at the time. Due to injuries stemming from the collision, both Cannon and Moura died.

Cannon, who lived in Pennsylvania, and Moura, who lived in Massachusetts, were drivers for New Prime, Inc. ("Prime"). Prime is a transportation company that contracts with customers to haul freight by tractor-trailer. Prime hired Cannon as an independent contractor in 2009. His independent contractor operating agreement (Docket No. 98-1) stated that he could refuse any load offered to him by Prime, subject to certain conditions. The agreement also required Cannon to procure workers' compensation insurance, or a suitable alternative, for himself and any other driver of his vehicle.

Cannon did not own the tractor he drove; he leased it from Success. Success is a company that leases tractors primarily to Prime and its independent contractors. While Success and Prime are separate legal entities, they are owned by the same individual. Both are incorporated in Nebraska and headquartered in Missouri, and they share certain employees.

Cannon's lease agreement with Success (Docket No. 102-5) described Cannon as the "Lessee" and Success as the "Lessor." Cannon did not pay Success directly for the use of the tractor, however. Instead, pursuant to Cannon's independent contractor operating agreement with Prime, Prime would deduct from Cannon's paycheck the amount Cannon owed Success each week and forward it to Success. Unlike Prime, Success is not a licensed interstate motor carrier, and does not hire, train, or qualify commercial drivers to operate tractor-trailers. Cannon's lease agreement with Success prohibited Cannon from making alterations to the tractor without written

2

approval from Success. Cannon's tractor-trailer was electronically monitored for continued refrigeration, speed, and location, and drivers of the tractor were required to input information into driver logs that would inform Prime of who was driving and how much rest each driver had.

Prime offers a driver training program, whereby individuals interested in becoming tractor-trailer drivers are matched with Prime drivers to gain experience. Independent contractors like Cannon benefit from this program because, with additional drivers, they can operate their tractor-trailers for longer periods of time. Prime hired Moura into its driver training program in September 2016. Moura was assigned to train with Cannon, a trainer in the program. Cannon did not interview or evaluate Moura prior to the assignment.

Around the same time, Cannon entered into a personnel service agreement with Prime. (Docket No. 98-2). The agreement stated that Prime would "lease" drivers to Cannon to assist him in transporting freight. The agreement described the leased drivers as being "employed by Prime only" and granted Prime the "sole authority to hire and fire the drivers." If Cannon became dissatisfied with a driver's performance, however, the agreement allowed Cannon to request that the driver be reassigned.

The agreement made Cannon responsible "for the supervision and conduct" of the leased drivers. Under the agreement, Cannon had to ensure that the drivers abided "by all work and safety rules of the Department of Transportation and Prime," and kept and maintained proper daily logs, daily vehicle inspections, trip reports, and other records required by law. In return for leasing a driver to Cannon, the agreement required Cannon to pay Prime the "amount of actual wages earned" by the driver, including all tax liability from such wages, the cost of the driver's workers' compensation coverage, and Prime's proportionate share of the driver's group health and life insurance.

Years earlier, Cannon also had signed an expectations agreement (Docket No. 98-3), which defined the relationship between lead drivers and second-seat drivers, or trainees. The agreement stated that the lead driver would be responsible for all operational decisions, that the lead driver would permit the second-seat driver to gain experience in all driving conditions, and that the second-seat driver would participate in all aspects of the job.

Moura first worked on Cannon's tractor-trailer on September 26, 2016, and aside from one break in November, he worked with Cannon until December 14, 2016, when the accident occurred. Following the accident, Moura filed a workers' compensation claim and received benefits. Later, after Moura's death, Prime entered into a lump-sum settlement with Plaintiffs for $1.3 million; the settlement was approved by the Massachusetts Department of Industrial Accidents. Prime ultimately paid over $1.8 million to or for Moura in workers' compensation benefits.

Prime's workers' compensation insurance policy also contained an alternate employers endorsement. (Docket No. 99-1). The endorsement stated that the policy applied to Prime's employees "while in the course of special or temporary employment by the alternate employer," and that the workers' compensation insurance would apply "as though the alternate employer is insured." The endorsement did not specifically list any alternate employers.

In December 2017, Plaintiffs sued Success and Estate of Cannon, among others, for wrongful death and common law negligence claims stemming from Moura's death. The Court has diversity jurisdiction over the claims. *See* 28 U.S. C. § 1332(a)(1). Defendants now move for summary judgment.

## **Legal Standard**

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." An issue is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it may affect the outcome of the suit. *Id.* When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

## Discussion

### 1. Personal Jurisdiction

Defendants first argue that summary judgment is appropriate because the Court lacks personal jurisdiction over them. Plaintiffs contend that Defendants have waived this defense. "Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Lechoslaw v. Bank of Am., N.A.*, 618 F.3d 49, 55 (1st Cir. 2010) (quoting *Insurance Corp. of Ireland Ltd. v. Compagnie des Bauxites de Guenee*, 456 U.S. 694, 703 (1982)). To avoid waiver, a party must raise the defense in its answer or responsive pleading. *See* Fed. R. Civ. P. 12(h)(1). Doing so, however, does not set the defense in stone. *See Lechoslaw*, 618 F.3d at 55; *Plunkett v. Valhalla Inv. Servs., Inc.*, 409 F.Supp.2d 39, 41 (D. Mass. 2006). Subsequent conduct that is "sufficiently dilatory and inconsistent" with the assertion of the defense may constitute forfeiture. *See Marcial Ucin, S.A. v. SS Galicia*, 723 F.2d 994, 997 (1st Cir. 1983).

Courts have found forfeiture of the lack of personal jurisdiction defense, despite a party raising the defense in its answer, when the party has engaged in considerable pretrial activity on the merits of the litigation. *See Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61-62 (2d Cir. 1999) (defendant engaged in merits discovery and settlement conferences over a four-year period before moving to dismiss for lack of personal jurisdiction, despite several clear opportunities to do so

5

earlier); *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297 (7th Cir. 1993) (defendants engaged in lengthy discovery and filed and opposed motions over a two-and-a-half-year period before actively contesting personal jurisdiction). Indeed, in *Plunkett*, 409 F.Supp.2d at 42, the court found forfeiture where the defendants, despite "marginally" raising lack of personal jurisdiction in their answer, waited over a year before asserting the defense in a motion to dismiss. In the interim, the defendants had "1) participated in a scheduling conference and engaged in a colloquy with the Court with respect to the nature of the case, 2) conducted discovery, 3) consented to Alternative Dispute Resolution, 4) entered into a stipulation and protective order with the plaintiff and 5) moved the Court to allow its Ohio counsel to appear *pro hac vice*." *Id.*

Here, Plaintiffs filed their complaint in December 2017 against Success, Estate of Cannon, and several other defendants. In March 2018, one of the other defendants -- represented by the same counsel representing Success and Estate of Cannon -- moved to dismiss for lack of personal jurisdiction. In October 2018, after a hearing, the Court denied the motion. Defendants answered Plaintiffs' complaint on November 2, 2018, raising lack of personal jurisdiction as an affirmative defense. When Plaintiffs amended their complaint a week later, Defendants filed an amended answer on November 30, 2018, again raising lack of personal jurisdiction as an affirmative defense.[1]

After that, however, Defendants engaged substantively in the litigation. Over the course of nearly two years, Defendants participated in six scheduling or status conferences with the Court,

---

[1] In Success' reply to Plaintiffs' opposition to Success' motion for summary judgment, Success states that on December 19, 2019, at the beginning of the deposition of Success' corporate designee, Success' counsel reaffirmed that Success did not consent to the jurisdiction of courts in Massachusetts. Success has not provided that portion of the deposition in its summary judgment papers, however. Nonetheless, even if Success' representation of the deposition is accurate, it would not alter my analysis or change the fact that Success then engaged substantively in pretrial litigation for nearly two years.

engaged in merits discovery, submitted two joint motions with Plaintiffs to extend the time to complete discovery, and submitted three motions to extend the time to respond to a motion to compel the production of certain documents. Defendants also responded to interrogatories, requests for production, and requests for admissions; they retained and designated expert witnesses for trial; and they participated in or defended thirteen depositions in four different states. Only then, in September 2020, did Defendants again raise the issue of personal jurisdiction in their motions for summary judgment.

Defendants' engagement has not been confined to disputing jurisdictional issues. *See Vazquez-Robles v. CommoLoCo, Inc.*, 757 F.3d 1, 3 (1st Cir. 2014); *Lothrop v. N. Am. Air Charter, Inc.*, 95 F.Supp.3d 90, 97-98 (D. Mass. 2015). Far from "assiduously attempt[ing] to assert the defense," *see Precision Etchings & Findings, Inc., v. LGP Gem, Ltd.*, 953 F.2d 21, 25 (1st Cir. 1992), Defendants' conduct ran counter to the spirit of Rule 12(h), see *Continental Bank*, 10 F.3d at 1297, and was inconsistent with the assertion of lack of personal jurisdiction, *see Marcial Ucin*, 723 F.2d at 997. Accordingly, I conclude that Defendants have forfeited the defense of lack of personal jurisdiction.

### 2. Success

Plaintiffs assert five counts against Success: two allege that Success was directly negligent; three seek to hold Success liable for Cannon's alleged negligence. "A federal court sitting in diversity applies state substantive law." *Levin v. Dalva Brothers, Inc.*, 459 F.3d 68, 73 (1st Cir. 2006). Plaintiffs and Success each invoke Massachusetts law, and neither party has pointed to any meaningful differences between Massachusetts law and the laws of other relevant states as they pertain to these claims. *See Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am.*, 338 F.3d 42, 46

(1st Cir. 2003). Accordingly, I will apply Massachusetts law. *See In re TelexFree*, 941 F.3d 576, 584 n.5 (1st Cir. 2019).

Success argues that summary judgment is appropriate on the direct negligence claims -- for negligent entrustment of the tractor to Cannon and negligent hiring, training, and supervision of Cannon -- because Plaintiffs have failed to establish evidence supporting such claims. Claims for negligence entrustment, hiring, training, and supervision all require some degree of knowledge on the part of the defendant that the individual subject to the defendant's entrustment, hiring, training, or supervision posed or poses some risk of harm. *See Helfman v. Ne. Univ.*, 149 N.E.3d 758, 775 (Mass. 2020) (negligent training requires showing that employer became aware or should have become aware of employee's unfitness); *Picard v. Thomas*, 802 N.E.2d 581, 587 (Mass. App. Ct. 2004) (negligent entrustment requires showing that defendant had actual knowledge of the incompetence or unfitness of the operator to drive the vehicle); *Cooke v. Lopez*, 785 N.E.2d 1247, 1250 (Mass. App. Ct. 2003) (negligent supervision requires showing parent's awareness of a child's dangerous tendency or propensity for harmful conduct); *Armstrong v. Lamy*, 938 F.Supp. 1018, 1046 (D. Mass. 1996) (negligent hiring requires showing that employer knew or should have known that employee was unfit or posed a danger to others in course of employment). Success points to Cannon's lengthy commercial driving history, and the fact that to qualify as a trainer in Prime's driver training program, Cannon had to obtain a recommendation from his "fleet manager" and undergo a review of his driving record. Plaintiffs have presented no evidence to suggest that Cannon was an unsafe driver prior to the accident, let alone evidence that Success knew or should have known about any such risk. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (nonmoving party must set forth, by affidavit or other evidence, specific facts responding to motion for summary judgment). Therefore, summary judgment is appropriate on these claims.

Success argues that summary judgment is appropriate on the vicarious liability claims -- for Cannon's alleged negligence in driving the tractor -- because Success did not have control over Cannon at the time of the accident, and because Success is shielded from liability by the Graves Amendment, 49 U.S.C. § 30106.

A defendant may be vicariously liable for another individual's negligence if the relationship between the defendant and the other individual is that of a master and servant. *See Cheek v. Econo-Car Rental Sys. of Boston, Inc.*, 473 N.E.2d 659, 660 (Mass. 1985). In the context of an automobile accident, that relationship exists if, at the time of the accident, the defendant had the authority and means to control the allegedly negligent driver's conduct. *See Covell v. Olsen*, 840 N.E.2d 555, 559 (Mass. App. Ct. 2006). Pursuant to M. G. L. c. 231, § 85A, evidence that the vehicle involved in the accident was, at the time of the accident, "registered in the name of the defendant as owner" is "prima facie evidence that it was then being operated by and under the control of a person for whose conduct the defendant was legally responsible." Thus, under M. G. L. c. 231, § 85A, the burden is on Success, as the registered owner of the tractor, to prove the nonexistence of a master-servant relationship between itself and Cannon, *see Cheek*, 473 N.E.2d at 660, making prevailing at the summary judgment stage particularly difficult, *see Covell*, 840 N.E.2d at 559.

Success need not meet that burden here, however, because Plaintiffs' vicarious liability claims are preempted by federal law. "A federal statute, known as the Graves Amendment, bars claims of vicarious liability against vehicle lessors." *Hallums v. Infinity Ins. Co.*, 945 F.3d 1144, 1146 (11th Cir. 2019). The Graves Amendment ("amendment"), 49 U.S.C. § 30106, provides:

> (a) In general.--An owner of a motor vehicle that rents or leases the vehicle to a person (or an affiliate of the owner) shall not be liable under the law of any State or political subdivision thereof, by reason of being the owner of the vehicle (or an affiliate of the

9

owner), for harm to persons or property that results or arises out of the use, operation, or possession of the vehicle during the period of the rental or lease, if--

(1) the owner (or an affiliate of the owner) is engaged in the trade or business of renting or leasing motor vehicles; and

(2) there is no negligence or criminal wrongdoing on the part of the owner (or an affiliate of the owner).

The amendment preempts state laws that impose vicarious liability on businesses that rent or lease motor vehicles. *Flagler v. Budget Rent A Car Sys., Inc.*, 538 F.Supp.2d 557, 558 (E.D.N.Y. 2008). Here, it is undisputed that Success was the owner of tractor at the time of the accident, and that Success was engaged in the trade or business of renting or leasing tractors. *See Garcia v. Vanguard Car Rental U.S.A., Inc.*, 540 F.3d 1242, 1246 (11th Cir. 2008). Moreover, the record is devoid of evidence that Success engaged in any direct negligence or criminal wrongdoing. While Plaintiffs allege that Success was negligent in entrusting the tractor to Cannon, and in hiring, training, and supervising Cannon, those claims, as discussed *supra*, fail as a matter of law. *See Berkan v. Penske Truck Leasing Canada, Inc.*, 535 F.Supp.2d 341, 345 (W.D.N.Y. 2008).

Plaintiffs argue, however, that the Graves Amendment does not apply due to the entangled relationship between Success and Prime. Plaintiffs cite *Stratton v. Wallace*, 2014 WL 3809479 (2014) in support of this point. In *Stratton*, 2014 WL 3809579 at *4, the court concluded that subpart (a)(2) of the Graves Amendment encompasses negligence or criminal wrongdoing on the part of the owner of the motor vehicle *and* the owner's affiliate. Thus, there, because there was an allegation that the owner's affiliate (a subsidiary of the same parent company as the owner of the vehicle) was negligent -- a point the court found "critical" -- the amendment did not preclude liability for the owner. *Id*. at *1, 4 n.3. Here, by contrast, even assuming that Success and Prime are affiliates within the meaning of the amendment, Plaintiffs no longer allege that Prime itself was negligent; nor is there any such evidence in the record. Accordingly, Plaintiffs' reliance on

*Stratton* is misplaced, and the Graves Amendment operates to preclude liability. Thus, summary judgment is appropriate on Plaintiffs' vicarious liability claims against Success as well.

### 3. *Estate of Cannon*

Plaintiffs seek to hold Estate of Cannon liable for Cannon's alleged negligence in operating the tractor-trailer at the time of the accident. Estate of Cannon argues that summary judgment is warranted because Cannon, as Moura's employer, was immune from liability under the Massachusetts Workers' Compensation Act ("act"), M. G. L. c. 152.

Regarding choice of law, Estate of Cannon asserts, and Plaintiffs do not dispute, that Massachusetts law applies. *See Jenny B. Realty, LLC v. Danielson, LLC*, 456 F.Supp.3d 307, 314 (D. Mass. 2020). Indeed, Plaintiffs accepted workers' compensation benefits in Massachusetts. *See Spencer v. Kantrovitz*, 392 F.Supp.2d 29, 35 (D. Mass. 2005). Therefore, I will apply Massachusetts law. *See Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 276 n.2 (2d Cir. 2013); *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426-27 (7th Cir. 1991).

The Massachusetts Workers' Compensation Act was enacted to guarantee payment to workers for workplace injuries, regardless of fault. *See Estate of Moulton v. Puopolo*, 5 N.E.3d 908, 914 (Mass. 2014). The act replaced a system of piecemeal tort litigation, which was "time-consuming, expensive, and afford[ed] no guarantee of compensation," *id.* at 914-15, with a uniform, statutory remedy, *see Saab v. Massachusetts CVS Pharmacy, LLC*, 896 N.E.2d 615, 618 (Mass. 2008). In exchange for accepting the statutory remedy, employees waive any common law right to seek compensation from their employer.[2] *Estate of Moulton*, 5 N.E.3d at 914. Such is the balance struck by the Massachusetts Legislature. *See Saab*, 896 N.E.2d at 621 ("it is not the role

---

[2] An employee may preserve the right to bring common law claims against his or her employer, and consequently waive the right to receive compensation under the act, by notifying the employer in writing at the time of hire. *See* M. G. L. c. 152, § 24. Moura did not do so here.

11

of courts to create a more comprehensive or logical system of compensation"). Accordingly, compensation under the act generally is the "exclusive remedy" for injuries suffered in the course of employment. *Estate of Moulton*, 5 N.E.3d at 914. The exclusivity provision, M. G. L. c. 152, § 23, has been described as the act's "cornerstone." *Berger v. H.P. Hood, Inc.*, 624 N.E.2d 947, 949 (Mass. 1993).

While the act prohibits common law recovery from an employer, the act permits common law recovery from liable third parties. *See* M. G. L. c. 152, § 15; *Wentworth v. Henry C. Becker Custom Bldg. Ltd.*, 947 N.E.2d 571, 573 (Mass. 2011). To determine whether a person or entity is immune from liability under the act -- and not a potentially liable third party -- Massachusetts courts employ a two-part test, asking (1) whether there was a direct employment relationship between the person claiming immunity and the injured party, and (2) whether the person claiming immunity is an insured person liable for the payment of workers' compensation. *See Roberts v. Delta Air Lines, Inc.*, 599 F.3d 73, 77 (1st Cir. 2010); *Fleming v. Shaheen Bros., Inc.*, 881 N.E.2d 1143, 1146 (Mass. App. Ct. 2008); *Lang v. Edward J. Lamothe Co., Inc.*, 479 N.E.2d 208, 209 (Mass. App. Ct. 1985).

As to the first prong of the test, the act "gives a broad definition of who may be an employer," *Roberts*, 599 F.3d at 77, that includes "an individual, partnership, association, corporation or other legal entity . . . employing employees subject to this chapter . . . [and] both the general employer and the special employer in any case where both relationships exist with respect to an employee," M. G. L. c. 152, § 1(5). The concept of general and special employers has long been recognized under Massachusetts law. *See Molina v. State Garden, Inc.*, 37 N.E.3d 39, 41 n.4 (Mass. App. Ct. 2015). "It is well settled that one who is the general servant of another may be lent or hired by his master to another, for some special service, so as to become, as to that

12

service, the servant of such third party." *Coughlan v. City of Cambridge*, 44 N.E. 218, 219 (Mass. 1896). The employment status of such a person turns on "whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master, or becomes subject to that of the party to whom he is lent or hired." *Id*. Ultimately, the "basic question is generally no different from the normal one in determining whether an employee is the servant of a particular principal." *Kelley v. Rossi*, 481 N.E.2d 1340, 1344 n.5 (Mass. 1985).

Whether an employment relationship exists under Massachusetts law turns on "who has direction and control of the employee and to whom does [the employee] owe obedience" with respect to his or her work. *Chisholm's Case*, 131 N.E. 161, 164 (Mass. 1921); *see Estate of Moulton*, 5 N.E.3d at 919. "Method of payment for work, though important, is not controlling in determining the terms of an employment relationship." *Fleming*, 881 N.E.2d at 1147. "The primary test is whether one has a right to control the individual's work performance." *Nat'l Ass'n of Gov't. Emps. v. Labor Relations Comm'n.*, 796 N.E.2d 856, 858-59 (Mass. App. Ct. 2003). Other relevant factors include "the skill required in the occupation in question; the purported employer's provision of tools, instrumentalities, and a place of work; and the parties' understanding of the nature of the relationship created." *Id.* at 859.

"Where the underlying facts are not disputed, whether an entity is an employer is a matter of law for the court." *Fleming*, 881 N.E.2d at 1147. Here, the material facts are not in dispute. Prime provided Moura and his services as a second-seat driver to Cannon, at Cannon's request. Cannon, an independent contractor and trainer in Prime's driver training program, and Moura, a trainee driver for Prime, agreed to work together. Cannon's expectations agreement put him in charge of "all operational decisions," and his personnel service agreement made him responsible for Moura's "supervision and conduct," including ensuring that Moura abided by all work safety

rules and maintained proper logs, inspections, and reports. Steven Field, Prime's Director of Safety, averred that Cannon was responsible for training Moura in the business of transporting freight and in the skills of driving a tractor-trailer, in supervising Moura as shipments were loaded and unloaded off the trailer, and in reviewing the accuracy of the documents Moura submitted to Prime. Field also averred that Cannon was responsible for setting driving shifts.

While Cannon did not hire Moura and could not fire Moura from Prime, Cannon could request that Prime substitute a driver in Moura's place if he became dissatisfied with Moura's performance. Field testified that Cannon could request that Moura be "taken off his truck, for whatever reason, whether it was compatibility, experience, [or] how he was progressing in training." (Docket No. 97-1). On this point, Darrel Hopkins, the Controller for Prime, testified that because "personalities become very important" when two drivers work and live together, Prime needed to "clarify to the independent contractor that you can fire [the leased driver] from your business, but you can't fire him from ours just because of personality." (Docket No. 97-2).

Cannon also paid Moura's wages, withholding taxes, and benefits (including workers' compensation coverage), albeit indirectly, by reimbursing Prime for the amounts it paid to or on behalf of Moura. And Cannon was responsible for the operation, maintenance, and repair of the tractor he leased from Success, at his own expense.

Plaintiffs point to several facts that they argue negate the existence of an employment relationship between Cannon and Moura. These include the fact that the personnel service agreement labeled Moura as "an employee of Prime only," an inference that Moura did not believe Cannon was his employer, the fact that Cannon did not pay Moura directly, the fact that Cannon did not interview, evaluate, or hire Moura, the facts that Cannon could not substitute Moura from his tractor-trailer without Prime's approval and could not fire Moura from Prime, the fact that

Cannon and Moura had been driving together for only three months, and the fact that Cannon did not comply with various employer-related regulations. These facts, however, while broadly disfavoring the existence of an employment relationship, do not outweigh the facts favoring the existence of such a relationship, even when all are viewed in Plaintiffs' favor.

At bottom, the evidence in the summary judgment record is that Cannon had the right to control Moura's work performance while Cannon and Moura were driving together in Cannon's leased tractor, including at the time of the accident. Plaintiffs have pointed to no evidence in the record creating a genuine issue about that control. There is no indication, for example, that Moura could operate independently on Cannon's tractor-trailer, or that Moura was beholden to Prime instead of Cannon.[3] To the contrary, the personnel service agreement states that although "Prime shall dispatch" Moura, "[i]n all other respects," Cannon "shall be responsible" for Moura's "supervision and conduct."

Indeed, the facts in this case are comparable to the facts in cases where an employment relationship has been found. In *Fleming*, 881 N.E.2d at 1147, for instance, the court concluded (on a summary judgment record) that there was a direct employment relationship between a defendant and a plaintiff because the defendant independently interviewed and hired the plaintiff, exclusively controlled the plaintiff's training, hours, and job duties, supervised the plaintiff's work, and indirectly paid the plaintiff's wages and workers' compensation benefits. In *Roberts*, 599 F.3d at 78, moreover, the court concluded that a plaintiff was an employee of a defendant because, at

---

[3] Plaintiffs' argument that Cannon was not directing or controlling Moura's activities because Prime monitored the tractor-trailer and dispatched travel routes, shipping points, customer contact methods, and loading procedures to both drivers is unavailing. To the extent it signifies a degree of control requisite for an employment relationship, it applies equally to Cannon and Moura. They would then be co-employees of Prime, and Estate of Cannon would be immune from liability. *See* M. G. L. c. 152, § 15; *Mendes v. Tin Kee Ng*, 507 N.E.2d 1048, 1051 (Mass. 1987).

all pertinent times, the plaintiff was under the direction and control of the defendant and reasonably had obligations to the defendant in the performance of her duties.  The undisputed facts in that case showed that "in practice [the defendant] exercised direction and control over [the plaintiff], and [the defendant] therefore was [the plaintiff's] employer under the [Massachusetts] common law test."  Although, here, Cannon did not independently hire Moura, could not fire Moura from Prime and, drawing all inferences in Plaintiffs' favor, was potentially limited in his ability to substitute Moura as a second-seat driver on his tractor, given Cannon's control over the use of the tractor and his responsibility to supervise Moura's conduct while Moura worked on the tractor, I conclude that, at the time of accident, a direct employment relationship existed between Cannon and Moura.  *See Nickels v. Bryant*, 839 N.E.2d 1211, 1215-18 (Ind. Ct. App. 2005).

As to the second prong of the test -- whether the person claiming immunity is an insured person liable for the payment of workers' compensation -- my analysis is guided by M. G. L. c. 152, § 18, which provides:

> In any case where there shall exist with respect to an employee a general employer and a special employer relationship, as between the general employer and the special employer, the liability for the payment of compensation for the injury shall be borne by the general employer or its insurer, and the special employer or its insurer shall be liable for such payment if the parties have so agreed or if the general employer shall not be an insured or insured person under this chapter.

Here, given my conclusion that an employment relationship existed between Cannon and Moura, Cannon was Moura's special employer, who "leased" Moura's employment from Prime, Moura's general employer.  Thus, Cannon had "liability for the payment of compensation" only if Prime and Cannon so agreed.

In *Molina*, 37 N.E.3d at 45-46, the court concluded that a general employer's "alternate employer endorsement" to its workers' compensation insurance policy constituted an agreement, as conceived by M. G. L. c. 152, § 18, between the general employer and a special employer, such

16

that the special employer would be liable for the payment of workers' compensation. That endorsement provided that the workers' compensation insurance "will apply as though the alternate employer . . . is insured," and it specifically named the special employer as the alternate employer. *Id.*

Here, Prime, the general employer, also had an alternate employer endorsement to its workers' compensation insurance policy. The endorsement similarly stated that it would apply "as though the alternate employer is insured." The only difference is that the endorsement did not specifically name Cannon as an alternate employer; rather, next to the words "Alternate Employer," the endorsement stated, "If Any." That Cannon was not specifically named, however, does not mean that Cannon was not covered by the policy. Indeed, according to an affidavit from an underwriter at Prime's insurer, the "If Any" designation is used by insurers of companies that routinely provide alternate employer status with respect to employees lent or leased to customers. The fact that Cannon was required to, and did, reimburse Prime for the cost of Moura's workers' compensation insurance supports a conclusion that he was covered by the endorsement, despite not being named. *Cf. Robidoux v. Muholland*, 642 F.3d 20, 24 (1st Cir. 2011). Accordingly, following *Molina*, I conclude that the endorsement constitutes an agreement between Cannon and Prime such that Cannon was liable for the payment of workers' compensation. Because there was a direct employment relationship between Cannon and Moura, and because Cannon was liable for the payment of workers' compensation, Cannon therefore was immune from tort liability under the act. Accordingly, summary judgment in favor of Estate of Cannon is warranted.

## Conclusion

For the reasons stated, Defendants' motions for summary judgment (Docket Nos. 93 & 95) are ***granted***.

**SO ORDERED**

                                                          */s/ Timothy S. Hillman*
                                                          **TIMOTHY S. HILLMAN**
                                                               **DISTRICT JUDGE**